We will hear argument this morning in case 19-840, California v. Texas, and the Consolidated Case. General Mondin? Mr. Chief Justice, and may it please the Court, in NFIB, this Court construed Section 5000A of the Affordable Care Act to create a choice to either obtain the health insurance addressed in Sub A or pay the tax described in Sub B. In 2017, Congress didn't change Sub A or Sub B, just reduced the amount of the tax to zero. 5000A still presents a choice, either buy insurance or do nothing. That inoperative provision doesn't harm anyone, and it doesn't violate the Constitution. Now, respondents insist that the 2017 amendment requires the Court to tear down the entire ACA, but that theory rests on two untenable arguments. First, respondents contend that Congress transformed Sub A into a command when it zeroed out the tax. That reading is contrary to this Court's construction of the same text. It's at odds with how Congress and the President understood the amendment, and it would attribute to Congress an intent to do exactly what this Court said would be unconstitutional. Second, respondents argue that if this single provision is now unconstitutional, then every other provision of the Act must also fall. But the starting point of any remedial analysis would be the strong presumption in favor of severability, and here the text and statutory structure powerfully confirm that presumption. After a year of debate about the future of the ACA, Congress made a single surgical change. It made 5000A unenforceable by eliminating the only legal consequence for not buying insurance, and it kept every other provision in place. So we know the rest of the Act should remain in effect if 5000A is held to be unenforceable, because that's the very framework Congress itself has already created. Mr. Chief Justice, I welcome the Court's questions. Thank you, General Mungin. I'd like to begin with the standing issues. Is someone who does not follow the mandate and purchase insurance violating the law? Not on our view, Your Honor. We think that this is an inoperative provision and there is no legal command. But even if the Court were to accept the plaintiff's theory that it is a command at the standing stage, they still can't establish standing because there's no threat or even any possibility that that command would be enforced against them. Well, so if someone who doesn't purchase insurance pursuant to the mandate applies for a job down the road and has to fill out a questionnaire asking whether you've ever violated the law, which box should he check, yes or no? Well, I think if their view, Your Honor, is that this is a command, I suppose they'd have to say that they violated the law. And if they had alleged that they were applying for such a job and that the employer was going to use such a form, then that might be a viable theory of standing. But, of course, there's no such allegation before us here today. Well, let's say Congress passes a law saying everybody has to mow their lawn once a week. And they even make a lot of findings about why that's a good thing. You know, it makes the country look neater, you get fresh air if you have to do that, supports the lawnmower business. But the fine for violating it is zero dollars. Do they have standing? I mean, the neighbors will see that they're not obeying the law. The objectives of Congress will not be fulfilled. In other words, there will certainly be injury to that person. And I wonder if under your theory that person would not be able to challenge the law. I don't think that they would be on the theory that they've altered their conduct to comply with the law and it suffered some injury. I think that follows from this court's cases in Poe and Holder and American Booksellers, that it's not enough to say that I'm injured by complying with the law. You also have to show some real threat of enforcement. And here, of course, Congress eliminated the only enforcement mechanism in 5000A. Thank you, General. Justice Thomas? Thank you, Mr. Chief Justice. General Mungin, putting it to the Chief Justice's question in today's terms, I assume that in most places there is no penalty for wearing a face mask or a mask during COVID. But there is some degree of opprobrium if one does not wear it in certain settings. What if someone violates that command? Let's say it's in similar terms to the mandate here, but no penalty. Would they have standing to challenge the mandate to wear a mask? Your Honor, I think under this court's cases, the question comes down to whether there is a real threat of enforcement. If it's just a bare command, I don't see how that would be consistent with cases like Poe and Holder that have looked not just to the question of whether it's a command, but to whether there is a threat or possibility of enforcement. Is that consistent with some of our, for example, our First Amendment jurisprudence, where even without a penalty you could have a chilling effect? Your Honor, I think that there may be other legally cognizable theories of injury beyond the type articulated by the plaintiff here, which is strictly focused on I'm complying with this command in a way that harms me. And in this case, you know, we're not in the First Amendment realm, but the state has suggested that there might be some theory of harm from the effects of third-party conduct that might have been a viable theory, but their problem is that they have not established with evidence that's required on summary judgment that the amended 5000A, which is entirely toothless, actually does inflict such a harm on them. The parties here, the respondents here, really they're arguing that, as we had in the first ACA case, they're arguing that the mandate in combination with the other provisions really caused their injuries. What is curious here is we have become accustomed to deciding this at the standing stage, and this looks somewhat like a statutory severability issue, looks like a statutory construction matter. So could you explain to me why we would determine severability at the standing stage? Well, Your Honor, I don't know that the court normally does determine severability at the standing stage. I suppose it could do that in the process of evaluating the federal government's theory of standing by severability. We don't think that that's a theory that's ever been endorsed by this court, and it seems like it would create some serious tension with this court's Article III precedent. But typically, severability would be analyzed after a ruling on the legality of the provision. So how would you say – I see my time is up. Thank you. Justice Breyer? Well, I'll follow up on Justice Thomas's question. But how do you respond to the United States' theory of standing? So it's a novel theory. It's never been endorsed by this court. It would create a fairly massive loophole in Article III because in the ACA context, for example, any American who's regulated by any provision of the ACA, biosimilars or the menu calorie count provision, would be able to challenge 5000A without showing that that provision actually harmed them. And I do think it's in tension with this court's Article III precedent in several respects. First, what the court has indicated in cases like Daimler-Chrysler is that a plaintiff needs to establish standing for each claim, and they need to show that they are injured by the allegedly unlawful conduct or provision. And here we'd be allowing on the government's theory, plaintiffs to proceed without doing that. And second, I think it would create a real concern about advisory opinions because, as I understand their theory, you'd have to accept that the provision is inseparable at the standing stage. Then you'd proceed to adjudicate the legality of the provision. And then after that, you'd get to severability. But as we know from AAPC, most provisions are severable. So it would lead to a situation where courts are adjudicating the legality of provisions that don't actually harm the plaintiffs before then. Thank you. Justice Alito? Texas has offered evidence that the Affordable Care Act requires it to calculate Medicaid eligibility using modified adjusted gross income, and that this method of calculation has greatly increased the number of persons on Medicaid in Texas. I think by about 100,000 persons. Why can't Texas seek a declaratory judgment that it is not required to calculate eligibility using that method? Well, I think that the problem is that they need to show that they're injured by the provision that they actually allege is unconstitutional. And that provision that Your Honor referenced is separate from 5000A. It would remain on the books even if 5000A were wiped away. So unless the court were willing to accept the novel theory of standing by and severability advanced by the federal government, I don't see how Texas' theories about many other provisions of BACA can establish a case or controversy with respect to this claim challenging amended 5000A. Well, there is logic to that theory of standing. Why is it conceptually unsound? Well, we think it's unsound because it then would allow a party to come into court and challenge any aspect of a large statutory scheme by just asserting a theory that it's inseparable from one provision that harms them. But Your Honor, if the court wanted to create that type of rule in its standing jurisprudence, that would just bring us to the merits. And the problem with the merits theory is that the plaintiffs here are positing that Congress created the very command that this court held in NFIB was constitutionally impermissible. And that's just not a plausible construction when you consider that Congress was well aware of this court's statutory construction. It relied on that choice-creating construction and used it to just render the provision inoperative. Let me ask this related question. If Texas were to fail to use that method, what consequences would follow? If Texas were to fail to use the method for calculating Medicaid eligibility, Your Honor? Yes. I don't know. I suppose it's possible that the federal government could bring some sort of enforcement proceeding against them or that an individual could sue on the theory that they should be eligible for Medicaid. I would ask a related question about what would happen if the IRS attempted to assess penalties on state employers for failing to comply with the reporting requirements in Sections 6055 and 6056. In a collection proceeding, could the state argue that it has no obligation to follow that because they can't be severed from the individual mandate? Those are separate provisions. I suppose it's possible that a defendant could try and advance that as a defense in response to such a claim, but that doesn't mean that as a plaintiff they can go into court and establish an Article III injury tied to 5000A that's sufficient to exercise the court's jurisdiction. Thank you. Justice Sotomayor? Counsel, if I understand, and please tell me if I understand your point correctly, which is if they have claims challenging the provisions that Justice Alito asked about, they should have brought that challenge, not a challenge based on the individual mandate, correct? That's exactly right, Your Honor. And although they have discussed a lot of the costs that flow from other provisions of the ACA, they haven't directly challenged those provisions and they haven't advanced any theory as to why those provisions are unconstitutional. Second, counsel, give me your best argument why it would be unreasonable or not legally enforceable for plaintiffs to read the individual mandate as a legal command. You answered Justice Roberts' questions in a hypothetical, but I'm asking, are you accepting that hypothetical or that assumption, not hypothetical, I used the wrong word, assumption, or do you have, what's your best argument that it's not a command? No, we're not, Your Honor. This court authoritatively construed 5000A and NFIB as not a command. Instead, it was a choice between buying minimum coverage as set out in sub-A or making the alternative tax payment in sub-B. That's an authoritative construction that Congress relied on when it amended the provision in 5000A. Congress did not clearly indicate that it wanted to depart from that choice construction. Rather, it relied on the choice construction, zeroed out the tax as a means of making the provision inoperative. And I think this is a critical point, Your Honor. Congress was entitled to rely on this court's authoritative construction, and we ought to give Congress the benefit of the doubt that it was doing what it said it was doing, preserving a lawful choice, rather than imposing the same... But, counsel, that I have no quarrel with, but why should we presume that a common citizen who wants to comply with the law would make that assumption? Or should make that assumption legally? Your Honor, I think that to the extent that a common citizen is considering the intricacies of federal law, they would consider this court's authoritative and very prominent holding about this provision in NFIB. And, of course, they would also consider the very public and repeated pronouncements of the President and members of Congress who said, we've gotten rid of the individual mandate, and now you're allowed to freely choose what to do with whether to buy insurance. One last question. I understand your standing argument involving the states, but are you arguing that the states are not harmed by the cost of more people enrolling in insurance as a legal matter? Or is it that as a factual matter, you think they have not yet demonstrated that they were harmed? As a factual matter, Your Honor, we're on summary judgment. It was their burden to introduce specific facts showing that amended 5000A actually drives up their costs. They put in 21 declarations, but they didn't actually address that point. So, how do you deal with their argument that you have the burden of coming forth with evidence? Well, I just don't think that that's consistent with precedent. It's the plaintiff's burden, that summary judgment, to establish that they have satisfied the requirements of standing. Justice Kagan? General, just continuing on this point of the state's standing, I mean, why wouldn't it be right to say something like, look, you can expect that as a result of this law, more people will buy insurance, even when there's no enforcement mechanism. Just the force of law itself will encourage people to buy insurance, and Texas is now saying, well, that costs us money. It costs us money because of its effect on programs like Medicaid, and it costs us money because we have to send out these forms saying that you've bought insurance. I think that those are Texas's two arguments. Well, Your Honor, we think under this court's precedence, in cases like Lujan, that might be enough at the pleading stage, but that it wouldn't be sufficient at the summary judgment stage. But frankly, Your Honor, if we're misreading those cases, we'd be happy to lose on the issue of state standing and litigate this case on the merits, and then have Texas's rather minimal showing here set the bar for state plaintiff standing theories going forward. We just don't think that your cases allow it. And why is that? What case doesn't allow it? Well, I think it's just the general principle that a plaintiff must adduce specific facts to establish injury and causation, as the court indicated in Lujan, and that, we would think, would require something more than speculation or supposition. And how about on the individual plaintiff's side? This is going back to the Chief Justice's questions. I mean, why shouldn't the force of law itself, you know, a person can say, if the law says I need to do something, then I have to do something. And we want citizens to be law-abiding. Why isn't that enough to create standing? Well, I understand that point, Your Honor, but I think that that's contrary to what this court has said in cases like Poe. I mean, there's a doctor plaintiff that I'm looking at this law. It says that I can't give advice to my patient. And I think the law is unconstitutional, and it harms me because I'm not able to give this advice. And the court said, well, that's not enough. You also have to show a real threat of enforcement. So I think that would be a departure from what this court has indicated before, and it might open the door to quite a number of additional pre-enforcement challenges. Thank you, General. Justice Gorsuch. Good morning, Counsel. Let me pick up where Justice Kagan left off. As I understand it, the United States could still bring a civil action to enforce the mandate under 26 U.S.C. 7402A. Is that your understanding as well? That's not my understanding, Your Honor. Your Honor, I think that this court made clear in NFIB that the only legal consequence of not purchasing insurance is the requirement to pay a tax. And Congress has repealed or zeroed out, rather, the tax. So there are no remaining legal consequences that I don't – Let's just suppose for the moment that you're mistaken and 7402A would allow a civil enforcement action. Would that change your view about the individual's standing? Potentially, although I think what this court has looked to is not just the possibility of an enforcement action, but whether there is a real threat of enforcement. And here I don't see how they've established that because, of course, the federal government has indicated that there's no further requirement for individuals to purchase health insurance, at least at the highest levels of the executive branch. That's the signal that's sent out to the country. So individual Americans would have to await an enforcement action before bringing a lawsuit challenging a federal statutory command? Well, that's our understanding of your cases, Your Honor. But, again, if we're misreading the standing cases, we're very happy to litigate this question on the merits because we don't think that they have any plausible basis for reading this as a command. And we'd be happy to have the court reach that question either at standing or on the merits. And then with respect to the states, again, picking up on Justice Kagan's point, I thought I heard you agree that the theory of standing, that there's raised costs on enrollment-based injuries or compliance-based injuries could be enough to secure standing. It's just a failure of proof at the summary judgment stage. Is that a fair summary of your position? Yes, that follows from Department of Commerce. States can establish standing if they actually identify specific facts showing that predictable choices by third parties are going to drive up state costs. But unlike the census case where we had lots of expert declarations and specific facts and detailed government memoranda showing that connection, Texas here has just not introduced any specific facts indicating that amended 5000A would inflict a concrete harm on the plaintiff's state. So if all we need is a substantial risk of a predictable effect of government action on the decisions of individuals, why isn't the Congressional Budget Office report stating that even after the penalty is removed, a small number of people will enroll because of a willingness to comply with the law? And it follows from that that there will be increased costs to the states. Your Honor, I think this CBO report from 2017 is probably the best thing they have going for them on state standing. We don't think it's sufficiently specific. It's a single sentence, and CBO didn't offer any data backing it up. Do you disagree with it? I don't think that we have any basis to agree or disagree with it. So it's an uncontested fact in the record? No, I don't believe that's right, Your Honor. It doesn't say anything specific to the plaintiff's states, and it doesn't say anything specific to plaintiffs who are eligible for state health plans, so we wouldn't think that that's enough at the summary judgment phase. Justice Kavanaugh? Thank you, Mr. Chief Justice, and good morning, General Mongin. To pick up on individual standing questions of the Chief Justice and Justices Kagan and Gorsuch, suppose Congress passed a law requiring every American who lives in a house to fly an American flag in front of the house. There's no penalty, and the question then is individual standing. Under Lujan, you're the object of the regulation as a homeowner. It's a forced acquisition of an unwanted good or service. Why isn't that enough to give you standing, knowing that some people are going to do that, buy the flags and fly them simply because Congress requires that? Your Honor, I think if their theory was identical to what the individual plaintiffs advance here, simply that we are actively complying with this and it is causing us harm, that would run into a similar problem with the POA line of precedent, but there may be some other legally cognizable injury, especially in the First Amendment context, and we're not disputing that plaintiffs can try and advance those types of theories of injury. We just don't think that they're substantiated under the circumstances of this case. On the CBO report that Justice Gorsuch mentioned, do you disagree that some people will follow the mandate and purchase insurance solely because of their willingness to comply with the law? I don't have a basis for disagreeing with it or agreeing with it, Your Honor. I think it is unlikely, as the dissenting judge below noted, that individuals who wouldn't already take advantage of the very generous Medicaid programs or state employer health plans would do it solely because of an unenforceable command. But again, if we're wrong on that, it just brings us to their untenable merits theory that Congress has created a command that this court said was constitutionally impermissible, even as it was telling the American people that it was trying to get rid of or make inoperative this provision. On the point that you mentioned that allowing individual standing here might open the door, are you aware of any other examples in the U.S. Code, at least, where Congress has enacted a true mandate, not something hortatory, but a true mandate with no penalties? Your Honor, I'm not aware of that, and we don't think that's what Congress did here. I take that point. I was just wondering if you were aware of an example. On the merits of the claim, under NFIB, obviously it was justified under the taxing clause, but it now doesn't raise revenue. How do you respond to that point? In light of the NFIB construction, what Congress did here was to create an inoperative provision. It doesn't require anybody to do anything, and Congress has routinely created inoperative provisions. It's done so since the founding, and they haven't been viewed as constitutionally problematic because they don't alter legal rights or responsibilities or bind anyone. Thank you. Justice Barrett? What should we make of the fact that Congress didn't repeal the provision? You said earlier repeal, and then you corrected yourself and said zeroed out. You're asking us to treat it as if it functionally has been repealed, but that's not what Congress did. Does that matter? Your Honor, I think Congress understood how this court had construed 5000A as a choice, and it understood that it would make the provision effectively inoperative to zero out the tax. And that was a reasonable thing for it to do. Obviously, it was operating under reconciliation procedures. That allowed it to make the change compliant with the Byrd Rule, and CBO had told it that there was no material difference between repealing the provision and zeroing out the tax. Let me ask you another question that's related to some of the hypotheticals you've heard so far. The Chief asked you about a mandate to mow the lawn, and then Justice Thomas asked you one about forcing people to wear a mask. What if, in this case, and as I understand it to be the case, you have to certify whether you've complied or not, and then the government keeps track of that? So the government keeps track of whether you wore a mask or whether you purchased health insurance. Does that change your view of whether there's an injury? I'm not sure that there is an ongoing certification requirement, at least in the tax forms, Your Honor. Perhaps that would change the analysis. But if we get to the merits, then I think that it's plain that this is not an operative provision, and there is no ongoing command. So even if that would establish standing, it wouldn't be enough to allow the individuals to prevail on the merits. And, Your Honor, I would like to just make the point that if the court were to disagree with us on the merits and hold that this is a naked command, then the only proper remedy for that would be an order making the provision unenforceable and holding that it's invalid. That would completely address the problem. What would be deeply problematic for the plaintiff, for the petitioner state, and for the rest of the nation is if plaintiffs were allowed to leverage this single inoperative provision to tear down hundreds of other provisions that Congress Let me just return to the question on the merits. So the states have said these Forms 1095B and C do require, as part of passes, for one to certify whether or not one has maintained the minimum coverage necessary. Is that incorrect? Well, Your Honor, the states do have to send out the forms. Those are required by separate provisions, and they serve continuing purposes related to the premium tax credit and the employer mandate to have nothing to do with 5000A. So those are costs that they would continue to have regardless of whether 5000A were on the books or not. And individuals don't have to certify whether or not they've maintained coverage? Well, the IRS website makes clear now that there's no longer an obligation on the annual tax forms to check the box regarding coverage. They've gotten rid of that requirement. Okay. Thank you, counsel. A minute to wrap up, General. Thank you. The plain intent of the 2017 amendment was to make 5000A inoperative and unenforceable, not to impose the very command this Court said would be unconstitutional. And the current statutory framework makes clear that Congress wanted every other ACA provision to remain in effect if 5000A were unenforceable because that's the precise situation Congress created. Respondents' inseparability theory would do violence to Congress's intent, invalidating hundreds of provisions that Congress chose to leave in place and that are functioning perfectly well without an enforceable 5000A. It would cause enormous regulatory disruption, upend the markets, cap 20 million Americans off health insurance during a pandemic, and cost the states tens of billions of dollars during a fiscal crisis. There's no basis for that result in text, intent, or precedent. Thank you, General. Mr. Verrilli? Thank you, Mr. Chief Justice, and may it please the Court. Respondents are asking this Court to do what Congress refused to do when it voted down repeal of the ACA in 2017. But their argument is untenable. The 2017 Congress did not convert Section 5000A from a choice to a command. The amended statute doesn't require anything of any one. And even if one misconstrues 5000A as a mandate, it's not plausible that the same Congress that had just eliminated any economic pressure to purchase insurance nevertheless thought that an unenforceable mandate was so vital that its invalidation should doom the remainder of the ACA. There is just no way that Congress would have preferred an outcome that throws 23 million people off their insurance, ends protections for people with preexisting conditions, and creates chaos in the healthcare sector. Respondents' arguments take constitutional adjudication as a game of gotcha to a whole new level. But this is not a game. This Court's precedents require respect for the constitutional role of Congress, and those precedents emphatically foreclose the outcome respondents seek. Mr. Verrilli, eight years ago, those defending the mandate emphasized that it was the key to the whole act. Everything turned on getting money from people forced to buy insurance to cover all the other shortfalls in the expansion of healthcare. And the briefs here on the other side go over all that. But now the representation is that, oh, no, everything's fine without it. Why the bait and switch? And was Congress wrong when it said that the mandate was the key to the whole thing, that we spent all that time talking about broccoli for nothing? So, Mr. Chief Justice, in 2010, I don't think there's any doubt that Congress made a predictive judgment about what would be needed to create an effective market, and they adopted a carrot-and-stick approach. And there were a lot of carrots. The policies were attractive, limited co-pays, no annual or lifetime caps. There were generous subsidies to draw people into the market, and it was easy to enroll because of the exchanges. But there was also a stick, the tax payment, if you didn't enroll. And I don't think there's any doubt that the 2010 Congress thought that stick was important. But it's turned out that the carrots work without the stick. That's the judgment that the Congress made in 2017. That's what the CBO told Congress. Congress asked the CBO, what will happen if we repeal the mandate outright? What will happen if we zero out the tax? And CBO came back and said, whether you zero out the tax or you repeal the mandate, the effects on the market will be the same. The market will remain stable over the coming decade. And if one looks at the amicus briefs filed by the health insurance industry, the Blue Cross brief, the AHIP brief, if one looks at the AMA brief, all those briefs are confirming that that judgment was correct, that it turned out that the carrots worked without the stick, brought enough people into the market to allow it to sustain itself. And, you know, Congress is allowed to learn from empirical experience in the world and adjust its policy choices, and that is what happened here. General Mungin was asked about whether the burden on the state was enough to support standing. And, of course, he had a little bit of a conflict representing the state, but you don't. Do you think that burden is sufficient? The paperwork burden, essentially. No, Your Honor, I don't, because the paperwork burden flows from provisions other than Section 5000A, and so unless the court were to accept the standing through inseverability theory, I don't think there's a basis for finding standing on the basis of that injury. Thank you, General. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, Justice Barrett asked whether or not just eliminating the penalty, the act wasn't changed, the mandate provisions weren't changed, just the penalty was eliminated. So was that all that was necessary to eliminate the centrality and importance of this provision? Because when you argue that when this case came up, as the Chief Justice said, some years ago, this provision was the heart and soul of the Affordable Care Act, and I know the assessment has changed, but the provision hasn't changed with the exception of the penalty. Could you explain why that penalty provision was so critical to the centrality of this provision? Well, I think, Your Honor, this does go to the heart of the severability question, and I guess the argument that my friends on the other side are making is that the continued existence of 5000A sub A, even though it's unenforceable and there's no tax anymore, is still central to the operation of the act, such that under the courts and severability precedents, Congress would have preferred that the entire act come down if that provision was struck down, and I think there are four reasons why that can't be right. First, you'd have to accept that the 2017 Congress said, we're going to eliminate any financial pressure to stay in the market, but the moral suasion is still so important that the entire law has to fall, and I just don't think that's a plausible account of what happened in 2017. Second, Congress asked the CBO, what would happen if they repealed? What would happen if they zeroed out the tax? And the CBO came back and told Congress, the effect on the market will be the same either way. In other words, there will be no material difference between zeroing out the tax and flatly repealing section 5000A sub A, and that's the context in which Congress acted here. Third, the contemporary's history is quite clear. The president, the congressional leadership, the bill sponsors, the committee chairman, they all were shouting from the rooftops that they were repealing the mandate and giving citizens complete flexibility about whether to purchase insurance. That is not what you would be saying to the world if you thought that moral suasion was essential to keep the system going. And finally, even if you thought that Congress really did have an interest in continuing moral suasion, that doesn't mean that they would have preferred to bring the whole ACA crashing down if 5000A were declared unconstitutional. In that respect, I think it's a lot like Celia Law. There, in contrast to here, you had actual evidence that Congress wanted the CFPB director to be independent of the president, and here was just a hypothesis. There was evidence, but the court made the judgment there that Congress would not have preferred to see the entire CFPB come crashing down if that independence were eliminated. And I think that same kind of reasoning applies very strongly here. Thank you. Justice Breyer, can you hear me? Justice Breyer? Yes. Thank you, Justice Breyer. Yes, I'm connected, I think. A question about the severability. Since at the time we heard when this was first passed that the mandate was absolutely crucial, as you pointed out, because unless people buy insurance under this mandate, the other provisions, such as you don't have to worry about pre-existing conditions, etc., won't work. All right, why isn't that fact? I'm sorry, Justice Alito? Something happened. I'm sorry, my machine didn't work. Yeah, I thought Justice Breyer was still on his time. No, Justice Alito? All right, well, thank you. Mr. Brutley, this does seem like deja vu all over again. Let me ask you this question about the theory of standing by severability. Suppose there's a very simple statute. It has two provisions, A and B. I am hurt by B. I am not hurt by A. A is unconstitutional. The statute has a clause that says if A falls, B falls, too. Under those circumstances, would I lack standing to challenge A? Well, that hypothetical definitely tests the limits of our objection to standing through inseverability, and I think it would be hard to maintain that position in the face of a statute like that. But what I will say, Your Honor, is this. What it does point up, I think, is that if the court is going to validate the theory of standing through inseverability for the first time, that it ought not to do so combined with a presumption of inseverability at the standing stage, because even situations like the one Your Honor's hypothetical describes are going to be very rare. Most of the time, as the plurality opinion and AAPC acknowledge, severability will be the outcome. And so if one presumes inseverability, even in cases like this one without an inseverability clause, then I think that is, as General Mongan identified, an open invitation to advisory opinions, because you're going to grant standing on the basis of the injury caused by provision B, hold provision A unconstitutional, and then say, but it's severable, and therefore the challenger doesn't get any relief. And so I think that's the problem. So I do think if the court really thinks that standing through inseverability is a valid theory of establishing Article III injury, that that ought to come with an analysis at the standing stage of the severability issue. What you have said about what Congress thought in 2017 perhaps illustrates the difficulty of trying to identify anything that was fought by the majority of Congress other than what it says in a law. A lot of people, a lot of members in 2017 may well have thought that eliminating the penalty or the tax would not cause any harm, and the whole act would continue to function well without it. But others who voted for it may have done so precisely because they wanted the whole thing to fall. So I don't know what we can make of what was done in 2017 along the lines that you've said. So, Your Honor, I think that question points up the wisdom of the analysis in the AAPC plurality to focus on objective indications, statutory text and context. And beyond that, I would say I don't think it would be an appropriate thing for the court to do to assume that there were members of Congress who were actually acting in violation of their oath to uphold the Constitution by voting for a provision they knew to be unconstitutional in the hope it would bring the law down. I just don't think that's a premise the court ought to indulge in any case, and certainly not in this one. But applying the objective factors, what we know is that Congress zeroed out the tax penalty, which is a very strong textual signal that Congress did not think that the 5000A sub A needed to, was necessary to play any significant role in maintaining these markets and, of course, the context here. Justice Breyer, we apologize for the audio difficulties, and we'll go back to you. That's all right. It's not a problem. Go ahead. Justice Sotomayor? Counsel, am I assuming your answer to be that given a choice between or among, because there could have been many choices, between invalidating the entire ACCA and just zeroing out the tax, that the 2017 Congress's choice was to just zero out the tax, correct? Yes, that's manifest on the record, Your Honor. There were efforts to repeal the entire ACA. Those efforts failed in the Senate. They were voted down. So we know that that effort to repeal the entire ACA was voted down, and the only change made was this zeroing out the tax in 5000A. And so if the choice is, yet again, after NFID, declaring the individual mandate unconstitutional, if one sees it as a command, the 2017 Congress has already told us that it doesn't want the rest of the act to fall, correct? That's certainly our position, Your Honor, and it just would be utterly inconsistent with everything Congress had before it, with the judgment Congress made and with the wide announcement to the public that this amendment effectively repealed the mandate. Counsel, there's an intuitive feeling that if the individual mandate is struck down, with respect to standing in the states, that they would have less reporting costs or less enrollees in their Medicaid and CHIPS program. That's their argument about standing, correct? That's their argument. Aside from inseparability, that's the only direct injury they claim flows from 5000A. Would you address that argument? Your co-counsel for the states seems to say there's no evidence that that's true or false, but I thought many of the briefs showed that it was a faulty premise for other reasons. Do you agree with that? Yeah, I mean, there's definitely no evidence. General Longin went through that. That's correct. It was summary judgment, and under Lujan, they had a burden. They didn't meet it. But apart from that, basically, their argument, I think, boils down to what they claim is common sense, which is, you know, look, people are going to read this mandate and they're going to enroll and that in Medicaid to satisfy it. But, you know, I really think it's the opposite of common sense. I mean, the theory here is there were people out there who weren't enrolled in Medicaid before, when the mandate was accompanied by a tax consequence, and therefore were subjecting themselves to the tax consequence. Congress amends it to get rid of the tax consequence, and those people say, oh, well, Congress got rid of the tax consequence, but look, there still seems to be a mandate, so I'm going to go enroll in Medicaid now. Mr. Varela, I understand your view that the appearance of how this law works has changed since 2010 or 2012, but we still have some relics of the old view, which is that the individual mandate was the key to everything, some relics of that in the law, and I'm pointing specifically at what the plaintiffs in this case sometimes call the inseparability provision, which is a finding, basically, that the mandate was essential to creating effective health insurance markets. And I guess I'm wondering, what do we do about that, the fact that that finding still exists in the law? Does that constrain us in any way? Well, it's clear that the – I think that it doesn't overcome the strong presumption of separability because it's not an inseparability clause. Now, if Section 18091 had said, if Section 5000A is declared unconstitutional, then 42SC300GG shall be deemed inseparable, those are the insurance protection provisions, we'd have to make an implied repeal argument. I think we'd have a strong one, but we don't need to make that because the finding is not an operative provision of law. It's just a finding, and I think what's key is that what it expresses is the 2010 Congress' view about the state of affairs that existed in 2010. As a textual matter, the provision is addressing Section 5000A as it was originally enacted in 2010, and that is the mandate to purchase insurance backed by the tax. Now, the argument that my friends on the other side are making is that the 2017 Congress must have continued to agree with that finding because it didn't repeal the finding. But the 2017 Congress couldn't possibly have agreed that a requirement backed by a tax consequence was essential to an effective market because the 2017 Congress eliminated the tax consequence. So I think that's very direct textual proof that the 2017 Congress did not share the view of the 2010 Congress expressed in the finding, and then it comes down to the question of whether you're going to strike this entire law down because the Congress didn't go back and clean up that finding. But there was no need to clean up that finding because, as I said, it's not an operative provision of law, and it expresses a predictive judgment about the circumstances that existed in 2010 and what the 2010 Congress thought would be necessary to create the market. And textually, of course, the finding talks about the requirement being essential to creating the market. And by 2017, the market had been created. It was up and running. CBO told Congress to continue to run in a perfectly reasonable way if you eliminated this penalty. So I think that remnant from the- Good morning, Mr. Burley. I'd like, if we could just for a moment, put aside standing and put aside your remedial arguments and just focus on the merits. This court held that the mandate was a permissible exercise of the taxing authority because it produced revenue, at least some. That seems to have withered away, and we're left with the Commerce Clause and the Necessary and Proper Clause, which the court foreclosed last time around. Can you help me with that? Sure. I think it might help for me to walk through how we see this, Your Honor. Congress started with the court's definitive construction of the law in NFIB. The court presumes that Congress takes this court's definitive construction as a given, unless it clearly indicates a desire to change it, and we don't think it did that. And so it starts from the premise that this is a lawful choice. It was a lawful choice between maintaining insurance or paying the tax prescribed in Subsection C. I don't think there's any doubt that Congress was acting within its powers when it amended Subsection C to reduce the tax to zero. You can either think of that as inherent in the tax power or Necessary and Proper to it, but it has to have the ability to take that step. And so what remains is a statute that isn't operative and doesn't have any consequences for anyone. So it's effectively like a statute that's been repealed, and that's, I think, why so many in Congress and the President described it as effectively as a repeal. Let's just put that aside for the moment, okay? If we're focusing on the merits and assume the mandate is still something, it's on the books, what are the merits of that under the Commerce Clause? Why aren't you clearly foreclosed by NFIB? Well, we're not making an argument under the Commerce Clause because of NFIB, of course. Our view is that because it's in an operative provision at this point, that it really doesn't have any more need for an enumerated power than when Congress enacts a hortatory statute. I understand the premise of Your Honor's question is to disagree with that. I think to the extent the Court thinks an enumerated power is necessary, we think it could be justified as Necessary and Proper to the taxing power because it leaves the framework of the taxing mechanism in place in case Congress wants to do it in the future. Thank you. Justice Kavanaugh? Good morning, Mr. Varelli. Assume standing for purposes of these questions and on the merits, the mandate is currently structured, seems difficult to justify under the Taxing Clause for the simple reason that it does not raise revenue, among others, so it's hard to call it a tax now. I think you were just indicating you can't justify it under the Commerce Clause because five justices in NFIB said you couldn't. Can you explain your Necessary and Proper argument just so I have that? You were on that. It's the one we made in our brief, Your Honor. It's that the way the law exists now, the Congress has maintained the structure that existed before the zeroing out of the tax in 2017 such that should Congress decide in the future that it needs to reimpose a tax, that it doesn't need to engage in wholesale reworking of the law. It can just step back in and change the number again. In that respect, it's not entirely different. It's not the same. I'm not saying it's the same. It's not entirely different from a tax law that Congress enacts where the tax is suspended for a number of years, and we think that suffices. But I do think, Your Honor, that what this points up, even if the Court disagrees with us here and even if the Court thinks that— I'm sorry to interrupt, Mr. Verrilli, but let's assume, just for the sake of argument, assume I don't agree with that and then we get to severability. I tend to agree with you that this is a very straightforward case for severability under our precedents, meaning that we would excise the mandate and leave the rest of the Act in place, reading our severability precedents. One of my questions is do you think that would have been the right result under the 2010 Act, or did that change in 2017, or how would you assess that? Well, I thought the amicus in 2010 made very strong arguments in favor of that result, but I do think the relevant point of inquiry was what did the 2017 Congress think, and I do think with respect—what would the 2017 Congress have preferred in the language of cilia law and the AAPC opinion? And I think the answer, the objective answer to that is quite clear, that if the very same Congress that zeroed out the tax and therefore removed any economic incentive, any economic suasion to get insurance, couldn't possibly have thought that the provision was— Thank you. Justice Barrett? Mr. Verrilli, if the court construes a statute in a particular way in order to avoid a constitutional question, wouldn't Congress be free to come back and say, no, no, no, that is what we meant, and in this case, for example, we did want to rely on the commerce power? In other words, why would an avoidance construction of a statute lock Congress in? Neither an avoidance construction nor a straightforward construction would lock Congress in, Your Honor. I agree with that, but here I think that—but I do think the presumption applies either way. Once this court has definitively construed a statute, that is what the statute means, and the court assumes that Congress takes that meaning as a given and can rely on that construction by the court when it amends the statute, and absent clear evidence that Congress wanted to depart from the court's definitive construction, the presumption is that the definitive construction stays in place, and I do think that has to be the case here because the only way to make sense of what Congress was doing and what, as I said, everybody involved in this process said Congress was doing was that they assumed that the choice-creating structure that was the definitive construction of the act after NFIB remained, and that by zeroing out the tax, they relieved any perceived need by anyone to purchase insurance if they didn't want it. That's what everybody involved in this process said they were doing. We say that when Congress zeroed out the tax, it was no longer a tax because it generated no revenue, and therefore could no longer be justified on the taxing power, so Congress was presenting it as a mandate which would have to be justified by the Commerce Clause. Well, I think for the reasons I said, Your Honor, and I do think that the statements by the legislature, by the legislators and the President and everyone else, I know that's legislative history in a sense, but I do think there's wide agreement that those kinds of statements can be looked to as evidence of the meaning that a provision is capable of bearing. It's clearly capable of bearing the meaning that we've identified, and it seems like the only explanation for what Congress did here is that they assumed that that was its meaning. If they had assumed the opposite and wanted to impose a command, I presume somebody would have said that, and everybody said the opposite, and of course— A minute to wrap up, Mr. Verrilli. Thank you. The Affordable Care Act has been the law of the land for 10 years. The healthcare sector has reshaped itself in reliance on the law. Tens of millions of Americans rely on it for health insurance that they previously couldn't afford. Millions more rely on the act's other protections and benefits. To assume that Congress put all of that at risk when it amended the law in 2017 is to attribute to Congress a recklessness that is both without foundation and reality and jurisprudentially inappropriate. In view of all that has transpired in the past decade, the litigation before this court, the battles in Congress, the profound changes in our healthcare system, only an extraordinarily compelling reason could justify judicial invalidation of this law at this late date. Respondents' arguments in this case are anything but. They should be rejected. Thank you. Thank you, Counsel. General Hawkins? Thank you, Mr. Chief Justice, and may it please the Court. This case should be resolved on the basis of three operative provisions that appear in the U.S. Code today. The first is the individual mandate, which is a command to the American people to purchase health insurance that the federal government deems suitable. The second is a penalty provision that ensures that the mandate raises no revenue for the federal government. The third is a legislative finding enshrined in the text of the law itself, declaring the mandate essential to the operation of the marketplace reforms that the ACA set out to achieve. The Obama Administration's Department of Justice described that finding as a functional inseverability clause. Under NFIB v. Sebelius, the mandate as it exists today is unconstitutional. It is a naked command to purchase health insurance, and as such, it falls outside Congress's enumerated powers. And the legislative findings declaring the mandate essential require this Court to conclude, as did the district court below and the joint dissent in NFIB, that the mandate is inseverable from the remainder of the law. In asking the Court to hold otherwise, petitioners are really asking this Court to ignore statutory provisions in the U.S. Code. Petitioners instead prefer to hypothesize about what various legislators might have been thinking when they voted to eliminate the penalty provision, yet retain the mandate and the legislative findings. But that's just an argument that this Court should set aside the text of the law in favor of non-textual considerations. That gets things exactly backwards, as this Court has confirmed time and again in recent years. There is no basis to ignore the words that Congress enacted and that remain operative today. The proper course is to take Congress at its word and declare the mandate unconstitutional and inseverable from the remainder of the ACA. General Hawkins, on the severance question, I think it's hard for you to argue that Congress intended the entire act to fall if the mandate were struck down, when the same Congress that lowered the penalty to zero did not even try to repeal the rest of the act. I think, frankly, that they wanted the Court to do that, but that's not our job. Well, Mr. Chief Justice, I would respectfully submit that it is this Court's job to follow the text of the law as written. And I think it's critical that in 2017, Congress could have excised the legislative findings in 18091, but it chose not to do so. I certainly agree with you about our job in interpreting the statute. But under the severability question, we ask ourselves whether Congress would want the rest of the law to survive if an unconstitutional provision were severed. And here, Congress left the rest of the law intact when it lowered the penalty to zero. That seems to be compelling evidence on the question. I don't think so, Mr. Chief Justice. I think what that establishes, or at least one reasonable reading of what happened, is that Congress wanted to give the American people a tax cut. And it went through lots of provisions of the Internal Revenue Code, cutting taxes here and there. And one place it found to give the people a tax cut was in 5000 AC. But it wanted to keep that mandate in place because the mandate would still drive people to acquire insurance. And indeed, it would have been quite reasonable for Congress to conclude that simply having a mandate will lead people to sign up for health insurance. As originally enacted, the Affordable Care Act included groups of people who were subject to the mandate but exempt from the penalty, including the very poor and members of Indian tribes. And I think that's an indication that Congress believed that simply ordering people to do something would get them to do it, notwithstanding any penalty that may be attached. General, you talked about the findings in the legislation and treat them as if they were in severability clause. But it doesn't look like any severability clause anywhere else in the rest of the U.S. Code to me. Well, Your Honor, there's certainly no magic words requirement for a severability clause or an inseverability clause. What we see in 18091 is a repeated emphasis by Congress that the mandate is essential to what they were seeking to accomplish. This is not some fleeting reference in one provision. In subsections H, I, and J, we see over and over again. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. General Hawkins, I think we're shadowboxing a bit here. The individual mandate now has no enforcement mechanism, so it's really hard to determine exactly what the threat is of an action against you. Could you comment on that a bit and just give us an understanding of what your injury is? Sure, Justice Thomas. So we've offered seven different bases to conclude that the standing requirement of Article III is satisfied. I would submit that the easiest path to confirm standing is through the injury that the states have suffered. In particular, the CBO confirmed in 2008 and 2017 that simply requiring people to sign up for health insurance would lead people to do so, and it's reasonably likely, based on that, that people will sign up for Medicaid who otherwise would not have done so because of the command to do so. Now, General Mungin suggested that we not put on evidence of that, and I respectfully disagree. We've put on the 2008 and 2017 CBO reports. The individual affidavits themselves at pages 73, 76, and 77 confirm that individuals will sign up just based on a command to do so, and there are numerous state affidavits, including from Mississippi, Missouri, and South Dakota, at 148, 154, or 187, talking about costs imposed by the mandate on the states, and we see the increased Medicaid enrollment set out in, for example, page 91 of the Joint Appendix, which is a Wisconsin affidavit. Now, we would submit that under Department of Commerce versus New York, that is more than enough to conclude that there's a substantial likelihood of at least one person signing up for a state Medicaid program, which, of course, would cause at least $1 in injury and satisfy the standing requirement. And that's just our first of seven theories. I'm happy to go through more if you're on the call. That's fine. I'd like to move to at which stage would you determine inseparability. You know, there's a lot of talk that we should consider this at the standing stage, but when I look at inseparability, I think of it as statutory construction and something more suitable for the merit stage, but I'd like your comment on that. Well, Justice Thomas, we think that this court has described the severability analysis as part of the remedial analysis, and so we submit that the proper course here is to conclude that at least one plaintiff has standing for any of the reasons we put forward, and then to conclude that the mandate is unconstitutional. And upon doing so, we would submit that that's when the severability analysis comes into play. Justice Breyer. Thank you. Turning to the merits, is your point, what do you say about many, many statutes, I suspect, that do have or could have statements do this, don't do that, or do this, and they do not have any enforcement, they do not have any effect? World War I, defense statutes, buy war bonds, an environmental statute, plant a tree, one of a thousand statutes commemorating something, beautiful city's day, clean up the yard. I mean, I can recall, or I believe, just dozens and dozens of statutes where Congress says something where normally we would say it's precatory. Now, are all those statutes suddenly open to challenge? I mean, are none of them? If so, you lose. And if it's in between, which ones are and which ones aren't? So, Justice Breyer, you asked whether they're open to challenge. I guess I'd want to know what the... Can you suddenly say, this is no good because people will do it. They'll buy war bonds. They will plant a tree. At least one of them will clean up the front yard. Okay? And thereby, I don't know, you see the point. It's a merits point. So, Justice Breyer, I guess I'd want to look at the particular statute. We know from NFIB that the government cannot order people to enter commerce, people who are not already in commerce. And if another statute is like that, then I think NFIB would control. You're missing the point. On each of them, there is some constitutional argument that if there were a penalty attached, it would be unconstitutional. They take the penalty out from all my examples. Now, no penalty. And do you say that they are nonetheless unconstitutional for whatever reason? If so, I think there will be an awful lot of language in an awful lot of statutes that will suddenly be the subject of court constitutional challenge. Justice Breyer, we don't dispute that inherent in the nature of sovereignty is the power for the government to speak. And so we don't challenge the idea of truly hortatory statements or Congress giving suggestions or recommendations. And if those statutes could be read that way, then that might change my answer. But what we have here, and this is I think the critical difference, it is not some suggestion, not some hortatory statement. It is the law of the United States of America today that you have to purchase health insurance, and not just any health insurance, health insurance that the federal government has decided would be best for you. And that is certainly subject to challenge. Thank you. Justice Alito? General Hawkins, can I ask you, I hope, two quick questions about your theories of standing. First of all, as to increased Medicaid costs, because you are required to calculate eligibility based on modified adjusted income, what would happen if you didn't do that? Well, we don't know for certain because we haven't tried, but I believe the federal government could bring some action against us, or somebody who should be eligible for Medicaid under the ACA but isn't because of the way we've done the regulations, I suppose, would be able to sue. Would there be penalties? Does the Affordable Care Act set out any penalties for failing to do that? I don't know of a specific penalty or fine that would be levied against the state in connection with a failure to comply with the MAGI requirements. Of course, there are penalties that states can suffer in connection with IRS reporting and other things like that. Okay, as to the reporting requirements in Section 6055 and 6056, the consequences for failure to comply with those, I believe, would be a penalty under the Internal Revenue Code, which this court has suggested is a tax for purposes of the Anti-Injunction Act. So how could that theory of standing survive the limitations imposed by the Anti-Injunction Act? Well, the provisions in 6055 and 6056 flow from the mandate and are echoed in IRS regulations. The 2020 instructions, which were released recently, say that the states have to provide this information to the federal government about how they are covering, as employers, their employees. And that reporting requirement itself inflicts a pocketbook injury on the states. Those forms don't produce themselves. And our theory is that that pocketbook injury itself is enough to satisfy Article III. I don't think that poses an AIA problem. And indeed, those injuries, as the Fifth Circuit correctly held, flow from the individual mandate itself and are traceable back to the mandate. Thank you. Justice Sotomayor? Counsel, I'd like to understand that a little bit more, your last statement. As I understood the theory you explained earlier of your standing, you say that you assume some people would comply voluntarily with the legal command at issue here, the individual mandate. As I understand it, the CBO report predicted that only a small number of people would do that, the exact opposite of what it said in 2009, because of a willingness to comply with law. But you have to take it a step further. You have to prove that that small number would include people who didn't enroll for Medicaid and didn't enroll for CHIPS when it was a legal requirement as a tax, but they would do so now after they're told there's no penalty for it, there's no tax for it. At some point, common sense seems to me would say, huh, there's only a small number of people who would do it. That small number of people have to include Medicaid and CHIP recipients to affect you as a state at all. And they would, once they're told there's no tax, enroll now when they didn't enroll when they thought there was a tax. Does that make any sense to you? It does make sense to me, Justice Sotomayor, under Department of Commerce versus New York. I would note that in that case as well, we were talking about a very small number of people who would unlawfully refuse to respond to the census if it included a citizenship question. And the standing theory in that case was premised on assumptions about people breaking the law. Our theory in this case, at least in part, predicated on assumptions about people following the law. The problem is that your theory assumes that people are going to pay a tax and break the law by not buying insurance, but they wouldn't do it when the tax is zero. That makes less sense. But moving on from that to the substance, okay? In NFIB, we said at least four times by my count that individuals cannot be compelled to buy health insurance under the common score clause. They could only be asked to make a choice under the tax clause. Now, the individual plaintiffs here still believe that there's a command, contrary to what NFIB said, that they must buy health insurance. Your only remedy would be to say that provision is unconstitutional under the commerce clause, and it's unconstitutional under the tax clause. But I don't understand why you're entitled to greater relief when NFIB only says, it already says it's unconstitutional. We could say it's unconstitutional now, but you're arguing that somehow us saying it a second time would convince Congress that it could command you to do something we said it couldn't do. Again, does that logic make sense? It does, Justice Sotomayor, based on the text of the law. The court, of course, in 2012 upheld- We said in NFIB that we couldn't read the text of the law the way your clients want us to because it would be unconstitutional. So, Justice Sotomayor, in 3A of the Chief Justice's opinion in NFIB, that part of the opinion notes that the best reading of the individual mandate is as a command to purchase health insurance. And then in subsequent parts, 3B and 3C, the Chief Justice explained that an alternative reading was fairly possible. That's what's missing today. There is no fairly permissible alternative reading of the law. And that leaves us with the conclusion in 3A of the Chief Justice's opinion that the mandate is best read as a command to purchase health insurance, and that is unconstitutional. And the text of the law says that the remainder of the ACA cannot work without that individual mandate. Justice Kagan? Yes, Mr. Hawkins, continuing on on the merits. I'm not sure I understand the position. In NFIB, we held that the ACA was not an unconstitutional command. So I would think that that has to be the starting point. Since then, there has been this change, and in this change where Congress reduces the penalty to zero, Congress has made the law less coercive. So how does it make sense to say that what was not an unconstitutional command before has become an unconstitutional command now, given the far lesser degree of coercive force? Well, Justice Kagan, I'd like to start with the premise of your question about the holding of NFIB. That holding is an alternative reading of the statute, a savings construction predicated on the fact that at the time, the individual mandate could possibly be read as glued together with the penalty provision. Well, I think you have to – excuse me if I might interrupt, General. I think you have to accept that holding, that that holding is what allowed the ACA to remain in existence all this time. I mean, so however it was that it was 4 plus 1 and what exactly that one said, the holding of the court was that the ACA was not an unconstitutional command. And we would submit this court is not bound by that holding today because the underlying predicate of that holding is no longer in the United States Code today. The only thing that's changed is something that made the law less coercive is what I'm suggesting. Well, Your Honor, what – If you make a law less coercive, how does it become more of a command? Well, Your Honor, the law was always best read as a command as 3A of the Chief Justice's opinion makes – You're just disputing the premise of what we held in NFIB, which has – I don't think you can dispute. But let me go on. So 5000AE says that a class of people, and these are mostly poor people, who were subject to the mandate, but those people are subject to the mandate but have never had to pay anything. Do you think that in NFIB what we really should have concluded was that those people were subject to a command whereas everyone else had a lawful choice? So I think that those people, the very poor members of Indian tribes, I think that if at any point they had brought an as-applied challenge, I think they would have been entitled to prevail because Your Honor is correct. From day one, Congress has been ordering them to do something, which is beyond Congress's commerce power. I mean, doesn't it seem exactly backwards, General, to say that those people who never had to pay a fin were subject to a command when people who did have to pay, who felt the coercive power of government, were not subject to a command? Your Honor, that is part 3A of the Chief Justice's opinion in NFIB indicating that the mandate is best read as a command. Now to some people, to many people, a savings construction was available at the time, but in 2017 Congress effectively took these subsection E exemptions and expanded them to everybody, and the result is that there is no tax savings construction now available and we're just left with a command. Thank you, General. Justice Gorsuch? Well, I'd like to pick up on that, on the merits. Mr. Hawkins, good morning. As I understood Mr. Verrilli, his argument on the merits is that this is still necessary and proper to the taxing power, and that coercive authority is still in play. It's just that Congress has chosen to set it at zero and wants the flexibility of retaining that provision in law because it might choose later to increase the tax again. What do you say to that response? I would say two things, Justice Gorsuch. Number one, this cannot be a tax because it does not raise revenue for the government and indeed cannot raise revenue for the government. In NFIB, the court noted, citing cases going back to the 1950s, that the essential feature of a tax is raising revenue. My second response, though, is that if the necessary and proper clause were to somehow save that, that would be giving Congress a police power. Everything is potentially a tax. And if Congress could justify any legislation on the grounds that, well, maybe one day we'll impose a tax, there would be no functional limit on Article I power. Let me turn to the remedial question here, if you could address it with respect to the individual plaintiffs. They've asked for declaratory and injunctive relief. I guess I'm a little unclear who exactly they want me to enjoin and what exactly they want me to enjoin them from doing. So the declaration, which was Count 1, on which the district court has entered partial final judgment, was a declaration that the mandate is unconstitutional and inseparable from the remainder of the Act. The defendants include the United States, HHS, the IRS, and their respective commissioners. And so the judgment would be a declaration that the defendants cannot, or excuse me, would be a declaration that the individual mandate is unlawful and inseparable from the remainder of the Act. What do we do about the fact that usually declaratory judgments in aid of preexisting remedial jurisdiction, we normally require some proof that we can remedy a plaintiff's injury more concretely than just a mere declaratory judgment? Well, here I think... You have to show that there would be an injunction that would be available, and this is essentially an anticipatory action. So two things, Justice Gorsuch. Number one, the United States and district court insisted that an injunction would not be necessary and that it would treat the declaration as an injunction, and we took them at their word. Second, if that's not good enough, count five in our complaint is still pending in district court, and that is our request for injunctive relief, and that's still a live issue before the district court, and we can pursue that remedy if necessary. Thank you, counsel. Justice Kavanaugh? Good morning, General Hawkins. Assume for purposes of my questions that there is a standing, just assume that. On the merits of the mandate before we get to severability, I want to follow up briefly on Justice Breyer's questions because my understanding might be a little different from his about the existence of other laws. I think when I asked General Mongan, he agreed with me that there are no examples in the U.S. Code that he's aware of where Congress has enacted a true mandate to do something to purchase a good or service, not something hortatory but a true mandate with no penalties. Is that right? I think it is, Justice Kavanaugh. I can't think of anything, and it would make sense that that were correct because the Affordable Care Act, of course, was an unprecedented statute. I believe that Congress had never tried to do before what it did here. With or without penalties, right? I believe that's correct. Then on severability, if the mandate can't be justified or the mandate is currently structured, I'm using the term mandate. I understand the arguments from the other side about that term, but the mandate is currently structured, can't be justified under the Commerce or Taxing or Necessary and Proper Clauses. We get to severability. And looking at our severability precedents, it does seem fairly clear that the proper remedy would be to sever the mandate provision and leave the rest of the act in place, the provisions regarding preexisting conditions and the rest. So the question to you, obviously, is how do you get around those precedents on severability, which seem on point here? Justice Kavanaugh, I get around them by relying on the text of the statute. AAPC, Your Honor's plurality opinion for the court, recognized that non-severability clauses can be statements of congressional intent. And as I noted earlier, the Obama administration's Department of Justice referred to 18091 as a functional inseverability clause. In that statute, we've got multiple instances of Congress insisting... I'm sorry to interrupt, but inseverability clauses usually are very clear, and we did indicate what they look like in AAPC, and we cited an example of what they look like. And, you know, Congress knows how to write an inseverability clause, and that is not the language that they chose here. So I agree with you about focusing on the text, very much agree with that. But I just have trouble seeing that as the equivalent of an inseverability clause. Justice Kavanaugh, we would respectfully submit that that would elevate form over substance. In subpart H, we see the mandate is essential to the larger regulation of economic activity. In subsection I, it's essential to creating effective health insurance markets. And the same thing again in subsection J. This is Congress saying over and over again that the mandate is essential to the operation of the law. And I don't believe there's any serious argument that Congress would have enacted the ACA in 2010 but for the individual mandate or without the individual mandate. Well, they did something to that effect in 2017, however. Well, in 2017, they gave the American people a tax cut, but they wanted, evidently, to continue ordering people to acquire health insurance, and they left in place the finding saying that that requirement is essential. And it's worth... Kevin, do you think in 2017, do you read Congress as having wanted to preserve protection for coverage for people with preexisting conditions? Because it sure seems that way from the record and the text. Well, Your Honor, we would submit that the best approach is to just look at what's in the United States Code rather than get into the game of what different legislators might have been thinking and saying in speeches and all that. And indeed, Congress certainly could have excised these findings. We've seen Congress amend legislative findings before in cases like Lopez where Congress amended its findings in response to this court's grant of certiorari. It's telling that Congress didn't do that here, and it's telling us... Thank you. Justice Barrett? Good morning, General Hopkins. I want to go back to Justice Gorsuch's questions about standing for the individual plaintiffs. So let's say that we agree with you that the mandate by making them feel legal compulsion to purchase insurance has caused them a pocketbook injury. Why is that traceable to the defendants that the individuals have actually sued here? I mean, I can see how it's caused by or traceable to the mandate itself, but how is it traceable, say, to the IRS or to HHS? Why is it their action that's actually inflicting the injury? Well, so, Justice Barrett, we have sued five defendants, including the United States, and this court has applied a longstanding presumption that the federal government acts in good faith, and by suing the five defendants who we have sued here, I think that's the best way of ensuring that the individual plaintiff's injuries from the individual mandate and the other parts of the ACA that interact with the individual mandate will be fully remedied. But doesn't it really seem that Congress is the one who's injured the individual plaintiffs here, and you can't sue Congress and say, hey, you've put us under this mandate that's forcing us to buy insurance and that's harming us, right? Well, we've sued the United States. It is the United States' law that the individual plaintiffs have to acquire health insurance that the United States thinks is good for them. Let me switch gears a minute and talk about state standing. There's some confusion, or, I mean, it's my confusion, based on differing positions taken in the briefs about these 1095B and C statements. So the House, at page 31 of its brief, says that the states would have to issue them regardless of whether the mandate is intact in the statute or not, but the states point to the cost of producing these forms and mailing them out as part of what's created their pocketbook injury. Who's right? So they are correct, Justice Barrett, that 6055 and 6056 are independently on the books. But if this court were to apply the longstanding presumption that the federal government will operate in good faith and respect this court's judgments, then it is reasonably likely that a declaration from this court that the mandate is unlawful would prompt the federal government to in any way reduce the administrative burden that that paperwork causes, including going through and saying who had what kind of coverage during which month. So I think that's enough to satisfy traceability and addressability as the Fifth Circuit correctly concluded. Okay. Thank you, counsel. General Hawkins, you can take a couple of minutes to wrap up. Thank you, Mr. Chief Justice. Just a couple of points. On standing, the regulatory burden that is imposed today by the IRS forms is the most straightforward way to conclude that the states have suffered a pocketbook injury. And in any event, Department of Commerce v. New York confirms that the states suffer another pocketbook injury as a predictable consequence of ordering people to sign up for insurance. Second, on severability, we submit that even if this court is disinclined to invalidate every provision of the ACA, it should at a minimum agree with the Obama administration that under the text of the law, the mandate is inseverable from the three-legged stool. Third, on practical effects, I want to emphasize that we recognize the reliance interests at stake in this regulatory regime. The district court has stayed its partial final judgment. If this court were to agree with us that the ACA is invalid, that state could be extended for an appropriate time to allow the states and political branches of the federal government an opportunity to accommodate those reliance interests, as we saw this court do in cases like Northern Pipeline v. Marathon Oil. Thank you. Thank you, counsel. General Ball? Mr. Chief Justice, and may it please the court, this case pushes at the line between faithfully following what Congress actually does rather than what it may have intended to do. When Congress eliminated the shared responsibility payment, it left standing what is now a naked command to obtain insurance, and it left standing the finding that that mandate is essential to the operation of other parts of the act. Those choices have legal consequences, whether or not the members of Congress who voted for the TCJA foresaw them. That's how this court normally approaches interpreting statutes, and it's how this court should approach the ACA here. I welcome the court's questions. General, your theory of standing is that a person who's not actually injured by part of the law can challenge that part of the law and, through that, try to strike down other parts of the law that do challenge him or that do injure him. I think that really expands standing dramatically. I mean, just in this act alone, you're talking about almost 1,000 pages, and you're letting somebody not injured by the provision that he's challenging sort of roam around through those 1,000 pages and pick out whichever ones he wants to attack. I think the reason there isn't a floodgates problem or a sort of massive loophole, Mr. Chief Justice, and the reason we haven't seen claims like Alaska Airlines is because, on the merits, it's just very rare that you're going to have this sort of textual evidence that overcomes the presumption of inseverability. And so these claims go out on a motion to dismiss if they're ever brought at all. But the theory, and Justice Alito was pressing this with Mr. Verrilli, I think, is he imagined a statute that had a clearly racially discriminatory provision and an express inseverability clause. I think the theory of the other side is that plaintiffs regulated by that statute couldn't challenge it, and that doesn't seem right to us. The plaintiffs here have an Article III injury. They want certain kinds of insurance payments. No, but it's a common feature. It's a common feature of standing that the result is people can't challenge provisions. I mean, it's an important doctrine. The only reason we have the authority to interpret the Constitution is because we have the responsibility of deciding actual cases, and that's what standing filters out. I agree with all of that, Mr. Chief Justice. The plaintiffs here, and this is in the amended complaint at paragraph 46, and then in their declarations that appear at pages 71 and 78 of the JA, they say that they're injured because they want plans that they had before the ACA and that they cannot obtain now, but for the ACA's insurance reform provisions. That's a straightforward Article III injury. Thank you, counsel. Justice Thomas? Yes, thank you, Mr. Chief Justice. General Wall, I'd like you to discuss at what stage we should confront the inseparability issue. There's much talk that we should do that at the standing stage, but again, I think, as I've said before, that it seems more like a statutory construction issue that you consider at the merit stage. Would you comment on that? The government's view is yours, Justice Thomas. The other side, my friends on the other side, keep referring to standing through inseparability. That's not right. Those two are distinct things. The plaintiffs here want insurance plans that they cannot get, that they used to have, but for the ACA. That's an Article III injury. It is an injury, in fact, in the real world for them right now. They want different kinds of insurance. On the merits, they have arguments about why those insurance reform provisions can't be enforced against them, and their argument on the merits is that the provisions are tied, as a matter of statutory interpretation, to the mandate, and the mandate is unconstitutional. Now, that argument may be right or wrong on the merits, Justice Thomas, but it doesn't have anything to do with standing. As you say, it's distinct from the standing inquiry. They have an Article III injury, then we move to the merits and severability, and as I was trying to explain to the Chief Justice, the reason that doesn't open the floodgates is because it's just rare that the text of the statute, which we know has to be the focus under AAPC and through the law, is going to provide the kind of evidence that would allow a plaintiff to overcome the presumption of severability. It's virtually always going to be true that the provisions are severable. It just doesn't happen to be true here given the unique wording of this statute. Thank you. Justice Breyer. Yes, I'm going to the merits, and I think I have a... I do have a very different understanding than Justice Kavanaugh. What I thought I heard said was that someone in the Solicitor General's office read through the entire United States Code, which must be quite a job, and discovered that there's no precatory language in the Code. There is nothing in the Code that says something like buy war bonds or something like plant a tree or something like clean your yard. Is that right? Justice Breyer, there's plenty of precatory language in the Code. If you say there is precatory language, precatory means, in the dictionary, pertaining to entreaty or supplication. Now, how is it that you know that this mandate, just by itself, without any penalty, is something more than a supplication or an entreaty? A couple of reasons, Justice Breyer. The first is that it says shall. You shall maintain minimum coverage, not that you're encouraged to do so. And the second is that when the majority in NFIB, in Part 3C, turned to the statute, it looked at not just subsections A and B, as my friends on the other side say, but also C. This is at page 562. So when it's looking at the statute and adopting the saving construction, it's looking at all three provisions and saying it has this essential feature of raising revenue. That's what allows us to take something that's more naturally construed as a command and read it as a tax. All right, so you had someone read through the entire United States Code, and you discovered that there is no precatory language in that code that uses the word shall. Is that right? Justice Breyer, I'm not aware of any, and in all the briefings... I didn't say you weren't aware of any. I might have a misplaced idea, but I remember when I used to work there, we passed lots of things like National Port Week and all kinds of stuff. That was precatory. Or said, let's have a celebration, or the nation shall, but plant a tree, et cetera. But you have read through the U.S. Code or someone in your office and has learned that there is no word shall in a precatory phrase? Justice Breyer, I cannot vouch that I have read the entire United States Code. I haven't either. I tell you I haven't either. But we have looked at this question, and all of the precatory provisions to which anyone has pointed or of which we are aware say things like should, not you shall do these things. So I'm not aware of statutes that say you shall buy... Between shall and should. Okay. That's a thank you. I think that's one key distinction, Justice Breyer. I would also point to not just the passage in NFIB, but the exemptions. There are exemptions from the mandate for people with religious exemptions and prisoners and illegal aliens. And if it really is just a choice conferring provision, as the other side says, a choice you would have anyway, just by virtue of existing, it's hard then to explain what the exemptions to that mandate do. Well, as you say that, it reminds me in English. Have I ever said or have you ever said to someone in your family, you shall do it, but that is an entreaty. An entreaty or a supplication rather than threatening a punishment. Have you ever heard that, Ewer? Use shall in respect to a supplication or an entreaty. No, Justice Breyer. In my family, when I tell my kids that they shall do things, that's a command backed by a penalty. Well, that's a much more organized family than mine. Justice Alito? Perhaps there's a difference between a supplication and a tax. Are you aware of any provisions in the code in which Congress has purported to use its taxing power to say you must do this. We're going to tax it and we're going to set the tax at zero. No, Justice Alito. The feature of this case that has a strange aspect is the sea change that's occurred. And the understanding of the role of the individual mandate between our first Affordable Care Act case and today. At the time of the first case, there was strong reason to believe that the individual mandate was like a part in an airplane that was essential to keep the plane flying so that if that part was taken out, the plane would crash. But now, the part has been taken out and the plane has not crashed. So if we were to decide this case the way you advocate, how would we explain why the individual mandate in its present form is essential to the operation of the act? I think a couple of things, Justice Alito. Yes, our basic position is that the finding and the findings are the functional equivalent of a targeted inseparability clause. The government said that back in an SIB. If the court, the joint dissenters, agreed with that, I think, and if the court had invalidated the mandate, I think there's good reason to believe that the court would have and should have also invalidated with a guaranteed issue and community reading because that was the most natural way to read the finding. And if that was the most natural way to read that finding, its text, before 2017, it's still the most natural reading. Nothing about the text of 2017 changed. Congress did a very targeted thing in 2017. It said, we don't want people to have to make this payment anymore if they don't want to get insurance. And yes, that was less coercive in a sense, as Justice Kagan pointed out, but more coercive in another, which is now it's just a naked command, and they didn't disturb the finding. And I take the point on the other side, that if you look at all these things from CBO reports, the statement of legislators, that you can divine in the collective consciousness of Congress the judgment that the finding was no longer correct, but they didn't amend or alter the text of the act. Thank you, General. Justice Sotomayor? Counsel, do you concede that Congress has the authority to enact taxes with delayed start dates? Yes. Okay. Can the Congress also enact taxes that phase out some years in the future? 10% this year, 8% next year, going down by two until five years from now. Can Congress do that? Absolutely. And, okay, so that you agree that if in 2020, Congress had enacted the share responsibility payment, the tax, to phase in in 2014 and phase out in 2009, that would have been permissible, correct? Yes. Let me finish, Counsel. If Congress had, in the TCGA, provided that the shared responsibility payment would be zero in 2019 and 2020 and 2021, but would phase back in as of 2022, would that be constitutional? I want to say one thing, Justice Sotomayor, which is I believe it would, but I think all of that would have been evidence before the court in NFIB why you wouldn't read it as a tax, because if you were sort of phasing it out, it would look more like a penalty that you were graduating down. But all that Congress did, answer the question to my last hypothetical. If Congress had, in the TCGA, provided that the shared responsibility would be zero for the first three years, but would start off at a certain percentage in 2022, would that be constitutional? If they had just delayed the payment of the shared responsibility payment, Justice Sotomayor, yes. So what's the difference between that and a decision often made by Congress that for a certain number of years, whatever fines, penalties, taxes were due from people, they're not going to collect. We've had cases with that where I think we had a case just last year where Congress was going to pay a bonus to soldiers and suspended that bonus for three years and then reapplied it later. What's the difference between that constitutionally? If Congress has the power constitutionally to delay, to extinguish, to restart, why is this any different, that at least two Congresses have chosen to forego the tax, but another Congress has the power not to? All of those other provisions, Justice Sotomayor, are written naturally like taxes. They say if you do a thing or you don't do a thing, you make a payment. The reason this is different is because once you eliminate the revenue-raising function, it's not naturally written like a tax, as the Chief Justice recognized it. It was never most naturally thought of as a tax. What allowed it to be reasonably construed as a tax was the revenue-raising function. Once you cut that out of the statute, it no longer reads like any of those provisions that have suspended or delayed taxes. It reads very differently if you set them side by side. Justice Kagan? General Wald, assume for the moment that I don't really buy your standing through inseparability theory. Could you tell me what your view is about whether the states or the individual plaintiffs have standing here? We haven't taken a position on that, Justice Kagan, because we think... I know you haven't, General, but I'm asking you for one, because we have to take a position on it. And, you know, think of this as a one-justice CBSJ. Justice Kagan, I think Justice Barrett was asking some very difficult questions about traceability with respect to the individual respondents. With respect to the states, I think at page 22 of Texas's brief, it's pointing to reporting and administrative costs in its direct role as an employer, and I think that might be enough to get the states standing. But, again, I want to emphasize the United States has not taken a position on that. Okay, I mean, the United States is usually pretty stingy about standing law, so it did surprise me, in much the way that it surprised the Chief Justice, that you're coming in here with a theory which, to my mind, threatens to kind of explode standing doctrine. I mean, and I guess I want to go back to that, because I wasn't sure I understood your answer to the Chief Justice. You know, a lot of legislation now is in these huge packages, I mean, even more than the ACA, that involve a thousand different subjects, omnibus legislation, where it's just everybody pours everything in that they can think of. And it would seem a big deal to say that if you can point to injury with respect to one provision, and you can concoct some kind of inseparability argument, then it allows you to challenge anything else in the statute. Isn't that something that the United States should be very worried about? And isn't it something that really cuts against all of our doctrine? We would be worried about it, Justice Kagan, if we thought that the floodgates were going to open. But Alaska Airlines was more than 30 years ago. People have been able to bring these claims for a long time. The reason they don't is that they rarely are... It's not a problem of Article III standing. It's not that they're not injured by these statutes. Can I just interrupt for a second, General? I just don't think that that's right. I mean, I have to say for myself, this theory was new to me, and I think it would be new to many people. And it's not so hard to construct some kind... All you have to do is to present a theory of severability. You don't have to win on your theory in order to make this, under your view, a proper Article III claim. But of course, Justice Kagan, the court, as a matter of avoidance, can do severability before doing the merits. We don't think it should care, but normally a court would. And if the theory of inseverability were weak, as it usually is, it's very hard to overcome the presumption of severability. The claim would go out on a motion of dismissal, which is why you don't sue the claims. I think the problem for the other side, just to drive home Justice Alito's hypothetical, is I think the other side is saying that even if you had a statute with an express inseverability provision and an obvious constitutional problem, like racial discrimination, so it was obvious that the statute was a legal nullity, everyone regulated by that statute couldn't challenge it until somebody came along who was racially discriminated against. And in an Article III standing matter, that doesn't seem right. Thank you. Justice Gorsuch? I'd like to just pick up where we left off there and understand from you your response to Justice Kagan and the concern about opening the floodgates here. Justice Gorsuch, we just don't see the problem because it's going to be, as I was trying to say, it's going to be very hard to make out an inseverability claim that's going to get you past the motion-dismiss stage, which is why we just don't see people walking in and challenging single provisions of omnibus acts because they don't have something like the textual finding here. It's rare to have an inseverability clause. It's even rarer to have a factual finding that goes to exactly the same question as you're asking when you do severability. And in all of the briefs in this case, no one has pointed to any other statute like this one. So I think, I understand the sort of reaction that we don't see this sort of theory very often. But again, I don't think that's a function of Article III standing. The plaintiffs here are injured. They want plans that they can't get. It's a function of the fact that their argument on the merits is not the type of argument that most plaintiffs, or hardly any plaintiffs, frankly, are going to be able to make, plausibly. Thank you. Justice Kavanaugh? Good morning, General Wall. Justice Breyer rightly points out that the U.S. Code has a lot of precatory language in it. My understanding matches his on that point. And to the extent the mandatory language here might be different and unusual, which was my question earlier, I think his question suggests, well, why not just construe this language as being similar to those precatory provisions that are strewn about the U.S. Code, which probably is both a standing and merits question, as I understood him to be asking. Can you respond to that? Sure. A few brief things, Justice Kavanaugh. The first is, of course, the court in MSIB said that the essential feature that allowed for the saving construction was that it raised revenue. Once Congress has eliminated that, I think they've cut out the basis for the saving construction, and then you have the word shall, which the Chief Justice recognized in FIB. It was naturally read as a command. It's read as a command in all of these other statutes. So I think the court would have to extend or stretch NFIB further than the court went there. With respect to the mandate as currently structured, you make a forceful argument that it's not justified under the Commerce for Taxing or Necessary and Proper Clauses, at least as construed in NFIB. But then we go to severability. Now, I understood your opening comments to say that the findings in the original act are, in essence, the equivalent of an inseverability clause. I just want to test that for a second. I mean, as you know, we have a strong background presumption of severability, which reflects a longstanding understanding of how Congress works and our respect for Congress's legislative role in Article I. And it also establishes a clear default rule or fairly clear default rule against which Congress can legislate. Congress knows how to write an inseverability clause, but this language is different from how that usually looks. So I just want to give you an opportunity to respond to that. Sure. So everyone agrees that there's no magic words requirement. And at that point, the finding speaks directly to the question here. It says the mandate, the requirement that you get into the market, is essential to guaranteed issue and community rating. And if, as the Joint Dissenters said in NFIB, once that triad is down, and as the Court of Columbia said there, it's very hard to limit it to the triad. It takes down the other pieces of the act. So I take the point, Justice Kavanaugh, that it's not written in the way one normally sees an inseverability clause, but it speaks directly to the question that the inseverability clause is meant to address, which is what is in the act that the mandate is essential to? And by its very terms, it says, and that's why I think the government argued powerfully in NFIB, that it's the equivalent of a targeted inseverability clause. Thank you. Justice Barrett. General Walz, the petitioners have pointed out that if, in fact, Congress zeroed this out and made it no longer a tax, they've argued that Congress would have deliberately done something unconstitutional by grounding this language if, in fact, it has force, assume that, in its commerce power. Do you think that it's indisputable that NFIB would render such an exercise of the commerce power unconstitutional? And I'm asking because, you know, there were five justices who thought that, but it wasn't a majority opinion who said it. So do you think there's room for doubt on that score? Well, I do think there is a passage in Part 3C, which was joined by five members of the Court, that does say it can't be upheld under the Commerce Clause. Justice Barrett, but even if it weren't, yes, I think it is clear from NFIB that if it is read as a command that is not permissible under the Commerce Clause, and I don't even take any of the parties, I don't take the House of California to be disagreeing with that. They're just disagreeing on the statutory question of how best to read it. And one quick point on that to finish my answer to Justice Kavanaugh, it says shall, but I think at that point it's very difficult to make shall do the work of should. That's just more work than avoidance can do. That move would be open to the Court in every case, like Lopez and Morrison. You could say, well, it just says that you shouldn't bring guns into school zones and you shouldn't commit domestic abuse. But the Court took those commands as what they were, commands that people shall do or not do something. Well, let's assume that I agree with you and that I think shall is shall and not should, and so it's a command. But don't you think then the petitioners have a point that if, as you say, and F.I.B. Swirly would say that the mandate would be unconstitutional as an exercise of the commerce power as opposed to the taxing power, that it would be odd for us to construe the statute as Congress saying, well, we're going to change the statute in a way that's going to render it constitutional or this provision in a way that will render it unconstitutional? I think they have a fair point that if you were trying to define the collective consciousness of Congress, it may be that many or most of its members didn't understand the legal consequences of what it was doing because all they were doing was something more targeted and they weren't thinking about the broader provisions or the findings or any of the rest. So I think it's fair to say that they didn't focus on this, but I don't think it's fair, Justice Barrett, to say that the Court shouldn't apply the act by its terms just because that would create a constitutional problem. That's exactly what NFIB said would be the case, and that's what Congress did, whatever it may have been thinking or whatever it might have intended to do. Thank you. A minute to wrap up, General. Thank you, Mr. Chief Justice. As you wrote in NFIB, quoting Chief Justice Marshall, the peculiar circumstances of the moment may render a measure more or less wise but cannot render it more or less constitutional. As it now stands, Subsection A requires every law-abiding American to obtain health insurance unless they fall within one of three exemptions. That broad mandate, whatever its wisdom or practical import, exceeds Congress's enumerated powers, and the Court should so hold. As for what that defect means for the ACA, Congress left standing the answer it gave in enacting the ACA, and whatever one's view of the wisdom of that answer in retrospect, the Court should respect Congress's answer, adhere to the text of the ACA, stay its mandate, and allow the political branches to decide how to proceed given the peculiar circumstances of this moment. Thank you. Thank you, General. General Mongan, you have three minutes for rebuttal. Thank you, Mr. Chief Justice. I have three points. First, if you read the text Respondent's Way, you have to attribute to the 2017 Congress an intent to impose the very command this Court said would be unconstitutional. The Court should avoid that result if there's any other possible way to read the text. And here there's an obvious alternative. If you adhere to the choice construction the Court gave to 5000A and NFIV, that just makes the statute inoperative, a choice between buying insurance or doing nothing. Now that's a somewhat unusual statute, but it aligns with this Court's authoritative construction. It's exactly how Congress and the President understood the amendment and what they told their constituents they were doing. It allows Americans to freely choose whether to buy health insurance. And I think I heard at least one of my friends acknowledge that on that reading, it would be constitutional. Second, AAPC makes clear that there's a strong presumption in favor of severability that can only be overcome with some powerful objective basis. Respondents cannot identify one here. Now this morning they pointed to the 2010 Commerce Clause findings, but those are not an inseparability clause. And they're not relevant to the severability question that's before the Court today because they address the significance of a different version of 5000A backed by a multi-hundred dollar tax consequence in the initial creation of health care markets. Congress zeroed out that tax long after the markets were created and after CBO told it that they would remain stable even if 5000A were repealed or made unenforceable. The text and structure that Congress created when it enacted that amendment confirmed the presumption of severability because Congress made 5000A unenforceable and chose to leave every other provision in place. And the remaining provisions aren't just capable of functioning independently, they have been functioning perfectly well ever since. Finally, whatever your approach to severability, it's common ground that any remedy should respect the separation of powers and should not invalidate any more of Congress's work than is absolutely necessary. And what's before the Court today is an enormously consequential statute. It provides health insurance and other life-saving benefits and protections to hundreds of millions of Americans. Now there's no doubt that it's been controversial. And in 2017, Congress debated whether to keep it. But Congress ultimately chose to preserve every provision while zeroing out the tax in 5000A. If that surgical amendment created a constitutional problem, there's only one remedy that would respect Congressional intent, and that's an order declaring that provision and only that provision unenforceable. Thank you. Thank you, General. The case is submitted.